GLADYS OHLSEN v. J. G. DILL COMPANY AND ANOTHER.[1]

May 10, 1946.

No. 34,166.

*Maugridge S. Robb,* for relators.

*Finstad & Ruenitz,* for respondent.

[1]Reported in 23 N. W. (2d) 15.

THOMAS GALLAGHER, JUSTICE.

Certiorari to review an order of the industrial commission awarding compensation to petitioner for the accidental death of Alvin H. Ohlsen, her husband. The referee found against petitioner. Upon appeal to the commission, it reversed the referee's decision and awarded compensation. Here, relators contend that the evidence does not sustain the finding that decedent's accidental death occurred within the scope of his employment and arose out of it.

Decedent was drowned about 11:30 a. m. on May 15, 1944, while fishing in the Des Moines River near Windom, Minnesota. He was then employed by relator J. G. Dill Company, a Minnesota corporation, hereinafter referred to as the employer, as manager of its elevator at Windom, a position he had held for about 18 months before his death.

Prior to such employment, decedent had been employed in the same capacity in the latter's elevator at Okabena, about 15 miles from Windom. The employer, having decided to terminate operation of the Okabena elevator in August 1942, thereafter transferred decedent to its Windom elevator as manager thereof. While at Okabena, decedent had built up a substantial business and was well liked by his customers there. Since Okabena and Windom are in the same territory, it was contemplated by the employer that the transfer of decedent to its Windom elevator would bring to Windom many of decedent's old customers at Okabena.

Decedent had made it his practice to entertain customers and prospective customers of his employer, both at Okabena and at Windom, by buying them lunches, coffee, and like items. He was interested in fishing and hunting and maintained an interest in a hunting point at Heron Lake and owned a boat which he kept on the Des Moines River near Windom. He was instructed and encouraged by his employer to entertain customers and prospective customers by taking them on hunting and fishing trips, in connection with which he was to furnish the equipment and pay the expenses. His ability to increase the business of his employer by

this method was recognized by the latter. Mr. Wayne B. Martin, treasurer of the employer corporation, testified:

"He told me right at the start he rather prided himself in being a little bit different than other country managers; that he spent quite a lot of time away from here, and he went around with certain fellows in the evening, in various sports, and he was quite a hunter—that he was a great fellow to go hunting and fishing. As a matter of fact, the thing he was concerned about was the fact that he owned three boats that were in the warehouse, and I asked him if he was spending a lot of time hunting and fishing, and he made the remark, 'No, that's a part of my business,' and I said, 'Just how do you figure that?' and he says, 'I do a lot of this with the customers, the farmers like to go out,' and he says, 'I go out in the evening a lot, and go to the farm meetings and so forth, thereby bringing in business'—so he looked like a good live wire to me, so we decided to go ahead and lease the elevator."

He further testified that after decedent had been transferred to Windom they continued the policy of developing business through the entertainment by decedent of customers and prospective customers, and that for the purpose of entertaining customers and promoting business and developing good will he was given an extra allowance of $25 per month. He stated:

"After he was in Windom two or three months, I came along one day, and he said that it was costing him quite a lot of money and he was working hard developing business. Our business had been poor in Windom previous to that time, and that he said he thought he should be entitled to something additional to cover this expense, so I told him rather than to keep track of each little item every time he bought a whiskey or a glass of beer, I asked him if $25.00 a month would be a sufficient amount to cover those expenses, and he said it would be satisfactory to him, so we paid him an additional $25.00 a month."

Mr. Martin further testified that on occasions when he visited Windom he found decedent absent on hunting and fishing trips with

customers and that at one time he had sent customers from the corporation's Wabasha office to Windom to be entertained by decedent on a pheasant hunt.

It is undisputed that this policy and this method of establishing good will and promoting business met with success. Prior to decedent's employment at Windom the corporation's business there had been poor. After he commenced employment and pursued the methods described, the volume of business increased substantially. Throughout his employment he continued to entertain customers and prospective customers, to take them on hunting and fishing trips, to purchase lunches, coffee, and like items for them, with the idea of promoting good will, all pursuant to the policy and instructions of his employer.

On May 15, 1944, the date of the fatal accident and also the opening day of the fishing season, decedent, in company with a fellow employe, had used his boat for fishing prior to the commencement of his day's work. He returned from this trip in time to open the elevator for the commencement of the day's business. Later in the morning, about 9:45 a. m., a Mr. George Morrison and a Mr. Pete Rankin, both friends of decedent, called upon him at the elevator. Mr. Morrison and many of his close relatives had been customers of decedent while he was manager of the Okabena elevator. He had called upon decedent at the Windom elevator on several occasions to inquire about the price of various products handled there. On one occasion he had sold some flaxseed to decedent at the Windom elevator. On the morning in question he again made inquiry of decedent as to the price of corn. After some further discussion, decedent accompanied Morrison and Rankin to the river and helped them into his boat. Thereafter he returned to the elevator to perform some work there. Shortly after this he left, got his boots at his home, and again went to the river. Morrison and Rankin, who were then fishing on the opposite side, rowed across to pick him up. The three then moved out into the river and commenced fishing. Shortly thereafter, while moving to a new position, the boat became caught in the current and went

over a nearby dam. The three occupants were thrown into the river, and Morrison and Ohlsen were drowned as a result. It is undisputed that all of this happened during the morning working hours of decedent.

The sole question for determination here is whether there is sufficient evidence to sustain the commission's finding that the accident occurred in the course of and arose out of decedent's employment.

■ The rule is well settled that, if upon a fair consideration of the evidence and the inferences to be drawn therefrom reasonable minds may arrive at different conclusions in connection therewith, the fact determination of the commission based upon such conflicting evidence must be sustained here. State ex rel. Niessen v. District Court, 142 Minn. 335, 172 N. W. 133; Furlong v. Northwestern Casket Co. 190 Minn. 552, 252 N. W. 656.

■ The law is likewise well settled that an employe is presumed to be working for his employer and in the course of his employment during the usual hours of such employment. See, Henry v. D. A. Odell Motor Car Co. 191 Minn. 92, 253 N. W. 110; Jeffers v. Borgen Chevrolet Co. 199 Minn. 348, 272 N. W. 172; Austin v. Leonard, Crossett & Riley, Inc. 177 Minn. 503, 225 N. W. 428. As stated in Novack v. Montgomery Ward & Co. 158 Minn. 495, 498, 198 N. W. 290, 292:

"The injury is received 'in the course of' the employment when it comes while the employe is doing his work. It may be received 'in the course of the employment' and still have no causal connection with it. * * * 'In the course of' refers to the time, place and circumstances under which the accident takes place. It may be 'in the course of the employment' and yet the employe may be standing still and not physically moving in his work. * * * He is still included when he does those reasonable things which his contact with his employment expressly or impliedly permits him to do. It 'arises out of' the employment when it reasonably appears from all the facts and circumstances, that there is a causal connection

between the conditions which the employer puts about the employe and the resulting injury."

In Henry v. D. A. Odell Motor Car Co. 191 Minn. 94, 96, 253 N. W. 111, 112, *supra,* the rule is stated thus:

"* * * The law does not require respondent to produce direct evidence of that fact [that accident arose out of and in the course of employment]. No particular *quantum* of proof is necessary. It is sufficient if there is in the record evidence which will reasonably sustain an inference or raise a presumption in support thereof.

\* \* \* \* \*

"* * * we hold that * * * when an employe within his usual working hours is upon the streets of the city where the very nature of his work requires him to be and is operating an automobile furnished him by the employer with which to perform that work, then, in the absence of evidence as to whether the employe was there for personal reasons or whether he was there to serve his employer, there arises a presumption that he is acting in the course of his employment, which presumption sustains the burden of proof until satisfactory evidence to the contrary is produced."

We have further held that, where an employe is specifically instructed and encouraged to entertain customers and prospective customers as a means of developing good will and increasing the business of his employer, accidents sustained while in the course of such activities are within and covered by the compensation act. Wold v. Chevrolet Motor Co. 147 Minn. 17, 179 N. W. 219. The question is one of fact for the commission.

We have repeatedly upheld the commission's determination on this question where the evidence thereon was in conflict. In Hoskins v. Austin-Western Road Machine Co. 190 Minn. 397, 399, 251 N. W. 909, 910, where we upheld the commission's determination that the employe at the time of the fatal accident was not engaged in the business of his employer, we set forth the rule as follows:

"In circumstances somewhat similar to those of relator courts have sustained findings that an accident arose out of and in the

course of the employment when it appeared that the employe when injured was engaged in cultivating the good-will of a customer or prospective customer of the employer by rendering some favor or service for such person. Relator cites Ocean A. & G. Corp. v. Industrial Comm. 32 Ariz. 265, 257 P. 641; Hartford A. & I. Co. v. Industrial Acc. Comm. 202 Cal. 688, 262 P. 309, 58 A. L. R. 1392; Pacific Ind. Co. v. Industrial Acc. Comm. 105 Cal. App. 535, 288 P. 129; Solar-Sturges Mfg. Co. v. Industrial Comm. 315 Ill. 352, 146 N. E. 572; Chase v. Emery Mfg. Co. 271 Pa. 265, 113 A. 840; Commercial C. I. Co. v. Strawn (Tex. Civ. App.) 44 S. W. (2d) 805. In each one the commission or court found that the injury was from an accident arising out of and in the course of the employment."

■ Here, there is ample evidence to sustain the commission's findings and decision. First, there is the testimony of the officers of the employer that the company had a well-established policy of promoting business through the entertainment of customers and prospective customers; that decedent had been instructed to follow out such policy; and that he had done so with the full knowledge and consent of his employer. There is ample evidence to establish that decedent had been authorized to take such customers and prospective customers on hunting and fishing trips such as the one here involved. There can be no dispute that not only was Morrison a customer of the employer, but, on account of his numerous relatives, who were likewise customers, that he was a particularly valuable one.

There is further evidence that, to reimburse decedent for the sums paid out for such entertainment purposes, the employer paid him an additional sum of $25 per month. That this policy was justified, if that be material here, is borne out by the fact that decedent's activities in pursuing it substantially increased the business of his employer. It is well known that many large corporations have adopted similar methods of producing business and have appropriated large sums and often employed men with no other duties to perform than the entertainment of customers and prospective cus-

tomers for the promotion of business. It is a well-recognized American business practice; and, if an employe while so engaged meets with accidental injury or death, such injury or death is presumed to be within the course of his employment and to arise therefrom, and, in consequence, is covered by the compensation act.

We hold that the evidence fairly establishes here that it was the policy of the company to entertain customers and prospective customers; that decedent was so advised and instructed; that he carried out such instructions and successfully increased the business of the company thereby; that· at the time of the fatal accident he was engaged in entertaining a customer or a prospective customer of his employer pursuant to such policy and instructions as part of his duties and employment.

Attorneys' fees of $250 are allowed respondent in addition to the statutory and ordinary costs and expenses.

Affirmed.